# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles 2/01/2024 9:06 AM David W. Slayton, Executive Officer/Clerk of Court, By S. Ruiz, Deputy Clerk

BRAD D. BRIAN (SBN 79001)
brad.brian@mto.com
BETHANY W. KRISTOVICH (SBN 241891)
bethany.kristovich@mto.com
ANNE K. CONLEY (SBN 307952)
anne.conley@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Plaintiff*
*MICHAEL Z. HERMALYN*

Michael B. Carlinsky (*pro hac vice forthcoming*)
michaelcarlinsky@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

David C. Armillei (SBN 284267)
davidarmillei@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Plaintiff*
*FVP, LLC*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| MICHAEL Z. HERMALYN and FVP, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>DRAFTKINGS, INC.,<br><br>Defendant. | Case No. 24STCV02694<br><br>**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND VIOLATIONS OF CAL. BUS. & PROF. CODE SECTIONS 16600, 16600.1, 16600.5, AND 17200**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Michael Z. Hermalyn, a California resident, and FVP, LLC ("Fanatics VIP"), a California Limited Liability Company (together, "Plaintiffs"), allege against Defendant DraftKings Inc. ("DraftKings") causes of action for declaratory relief, injunctive relief, and violations of California Business & Professions Code Sections 16600, 16600.1, 16600.5, and 17200, as follows:

## INTRODUCTION

1. Plaintiff Mr. Hermalyn, a California resident, recently accepted an offer of employment from Plaintiff Fanatics VIP, a California-based affiliate of the global digital sports platform Fanatics Holdings, Inc. (together with its subsidiaries and affiliates, including Fanatics VIP, "Fanatics"). Mr. Hermalyn serves as the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California office. This position requires Mr. Hermalyn to live and work in Los Angeles, California, where Fanatics currently employs approximately 80 people. Fanatics believes Mr. Hermalyn's unique skills and talents will contribute to Fanatics' ability to thrive in California, growing its economic impact in the State and serving California consumers, while providing additional corporate leadership in California specifically and the West Coast more generally.

2. Defendant DraftKings, Mr. Hermalyn's former employer, has sought to improperly constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict Fanatics VIP from employing him, in direct violation of California law and public policy. DraftKings' employment-related agreements with Mr. Hermalyn contain overbroad and illegal post-employment restrictive covenants, including global, 12-month noncompete, client nonsolicitation and no-service, and employee nonsolicitation and no-hire prohibitions. These sweeping provisions purport to prohibit Mr. Hermalyn from being employed in the betting and gaming space in which he has worked for 16 years, from engaging in any work pertaining to fantasy sports, betting and gaming, and various other industries, and from communicating with his former clients and co-workers. The restrictions have no geographic limitation, and purport to extend to "any place within the United States or anywhere else in the world." DraftKings' employment-related agreements also call for litigation in Massachusetts,

under Massachusetts law—despite the fact that Mr. Hermalyn has never resided or worked there. When Mr. Hermalyn worked for DraftKings, he resided in New Jersey and worked from DraftKings' New York office space when he was in an office. And Mr. Hermalyn is now a resident of California, has been offered lawful, California-based employment for a California company, and DraftKings is attempting to interfere in California with that employment opportunity.

3. The State of California has a long-standing law and public policy against such post-employment restrictive covenants. California has instead espoused a public policy in favor of employee mobility and robust competition. California Business & Professions Code Section 16600, subdivision (a) provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." For decades, California courts have relied on this statute to prohibit noncompete, client nonsolicit, and employee nonsolicit agreements with employees in California like those at issue here.

4. To further protect California residents and employees, California courts have declined to enforce foreign state forum selection clauses in restrictive covenant cases. And California courts have further declared restrictive covenant provisions illegal and unenforceable under California law, even where the employees at issue ***did not ever reside in California—for their prior or new employers*** (but became employed by a California company), and the agreements at issue called for application of another state's law (rather than California law).

5. Last year, the California Legislature reinforced its commitment to these principles by passing two new laws, codified at California Business & Professions Code Sections 16600.5 and 16600.1, effective January 1, 2024, which codify California's prohibition on restrictive covenant agreements even to ***agreements between employers and employees in other states***. These laws also impose new, mandatory notification requirements on businesses that utilize restrictive covenants, provide that violations of the restraint of trade laws constitute acts of unfair competition, and grant employees a private right of action for injunctive and/or monetary relief arising from such violations.

6. In passing the laws, the Legislature emphasized that they "would prohibit any employer from attempting to enforce a void contract, including seeking enforcement in a non-California court."

7. Mr. Hermalyn seeks to continue his employment with Fanatics VIP as President and as the Head of Fanatics' Los Angeles office, without any unenforceable prohibitions and restraints imposed by his agreements with DraftKings. By contrast, DraftKings seeks to improperly squash such business activities and perceived competition based on its unlawful post-employment restrictive covenants and unenforceable foreign law and forum provisions.

8. Accordingly, in light of this ripe dispute, and to prevent DraftKings' further contravention of California law, Mr. Hermalyn and Fanatics VIP file this action requesting declaratory judgment that the post-employment restrictive covenants, including the foreign state law and forum provisions, in Mr. Hermalyn's agreements with DraftKings are void and unenforceable under California law.

9. Specifically, Mr. Hermalyn and Fanatics VIP request a declaratory judgment from the Court that: (i) Mr. Hermalyn may freely compete against DraftKings, including by working as the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California, office, including by providing services to the businesses across the Fanatics portfolio of companies (*e.g.*, companies engaged in the collectibles, betting and gaming, licensed merchandise, and media and events business), soliciting and servicing clients on behalf of Fanatics VIP, and recruiting, soliciting, and hiring employees to Fanatics VIP; (ii) Fanatics VIP may continue to employ Mr. Hermalyn in this capacity; (iii) Mr. Hermalyn's post-employment restrictive covenants with DraftKings, including the noncompete, client nonsolicit and no-service, and employee nonsolicit and no-hire prohibitions, are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; and (iv) the Massachusetts choice of law and forum provisions are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1.

10. Mr. Hermalyn seeks injunctive relief against DraftKings voiding under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600, his post-employment restrictive covenants and the Massachusetts law and forum provisions contained in Mr. Hermalyn's agreements with DraftKings, and enjoining violations of these laws by DraftKings, and all related available relief.

11. Finally, Mr. Hermalyn and Fanatics VIP seek all available relief under California's Unfair Competition Law, California Business & Professions Code Section 17200 et seq., including monetary damages, as a result of DraftKings' unfair business practices and unenforceable restrictive covenants that chill lawful competition.

## THE PARTIES, JURISDICTION, AND VENUE

12. Plaintiff Mr. Hermalyn is an individual who currently resides in Los Angeles County, California. As of February 1, 2024, Mr. Hermalyn is employed by Fanatics VIP. He serves as the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California office. Mr. Hermalyn was previously employed by DraftKings, and during that time, he lived in Bay Head, New Jersey, and worked from DraftKings' New York City office when he was in an office.

13. Plaintiff Fanatics VIP is a limited liability company formed in California, with headquarters in Los Angeles, California. Fanatics VIP is a California-based affiliate of the global digital sports platform Fanatics Holdings, Inc. Fanatics has had a Los Angeles office since 2022, and currently employs approximately 80 people there. Fanatics also maintains offices in Irvine and San Mateo, California.

14. Defendant DraftKings is a Nevada corporation that is headquartered in Boston, Massachusetts. DraftKings is publicly traded on the Nasdaq Stock Exchange under the ticker symbol "DKNG." DraftKings is a global daily fantasy sports contest, sports betting, and online gaming company. According to DraftKings' noncompete agreements with Mr. Hermalyn from 2023, "the Business of the Company [DraftKings] is global in nature." DraftKings does business in California. DraftKings is registered to do business in California as an out-of-state corporation, and it has a registered agent in California for the service of process. DraftKings also has multiple

licensees and distributors based in California, including Bleacher Report, Alphabet, and Apple, among others.

15. As an example of DraftKings' business activities in California, DraftKings' daily fantasy sports contests are advertised and made available to consumers in California, including in this County. DK Horse (DraftKings' affiliated horse racing product) is available to residents of California. DraftKings operates a NFT (non-fungible token) Marketplace that is available in California for California residents. California residents are offered sign-up, odds browsing, and free-to-play pools and fantasy sport leagues with DraftKings through websites and mobile applications available in California. Consistent with these California business activities, DraftKings' privacy policy, available on its website, has a standalone section (Section 12) specifically for California consumers. Based on information and belief, DraftKings' Senior Vice President of Business Development is based in California. And DraftKings has engaged in substantial outreach to California—including, on information and belief, to lawmakers and voters in this County—through advocacy efforts and advertising related to a sports-betting ballot measure in California, reporting in its SEC filings that it has spent tens of millions of dollars on these efforts in recent years.

16. Venue is proper in Los Angeles County, California, as Mr. Hermalyn resides in Los Angeles County and works for California-based Fanatics VIP as its President and as the Head of Fanatics' Los Angeles office in this County. Fanatics VIP is a limited liability company formed in California, with headquarters in Los Angeles, California. DraftKings' liability arises in Los Angeles County, as both Mr. Hermalyn and Fanatics VIP are being harmed by DraftKings' anticompetitive conduct here, and DraftKings is interfering with their business relationships here. As noted above, DraftKings is registered to do, does, and actively seeks to expand its business in California, including, on information and belief, in this County.

## FACTUAL ALLEGATIONS

### A. Mr. Hermalyn's Employment With DraftKings

17. From approximately September 14, 2020 through February 1, 2024, Mr. Hermalyn was an employee of DraftKings.

18. His internal title was Vice President of Growth. In that role, Mr. Hermalyn was responsible for retaining and acquiring certain categories of customers for DraftKings.

19. During his employment with DraftKings, Mr. Hermalyn resided in Bay Head, New Jersey, and was based out of DraftKings' office in New York, New York.

20. While DraftKings is a Massachusetts-headquartered company, during his employment with DraftKings, Mr. Hermalyn never resided in Massachusetts, and was never based out of DraftKings' Massachusetts office.

**B. <u>Mr. Hermalyn's Resignation From DraftKings</u>**

21. On February 1, 2024, Mr. Hermalyn resigned from DraftKings. He informed DraftKings in his resignation notice that he intended to accept employment with Fanatics in California.

22. Prior to resigning, Mr. Hermalyn took steps to ensure he was no longer in possession of any DraftKings property or confidential information. He returned any DraftKings-issued devices. He worked with his counsel to ensure that any documents and information developed in connection with his work for DraftKings were no longer in his possession. He even sent his personal phone to his counsel, and bought a new phone, to ensure that it did not contain any DraftKings information. He confirmed to DraftKings in his resignation notice that he had turned over all DraftKings property (e.g., his work computer, corporate credit card, portable wifi) and information to his lawyer.

**C. <u>Mr. Hermalyn's Employment With Fanatics VIP and Residence in California</u>**

23. After resigning from DraftKings, Mr. Hermalyn accepted his offer of employment from Fanatics VIP. He presently serves as the President of Fanatics VIP and the Head of Fanatics' Los Angeles office.

24. Fanatics is a leading digital sports platform, operating businesses across the United States, including California, and across a number of industries, including collectibles, commerce (the design, manufacturing, and sale of licensed apparel and hard goods), and betting and gaming, and with emerging businesses in live events, media, and more. Fanatics VIP is a California company.

25. For years, Fanatics has conducted business in California and maintained offices here. Fanatics has had an office in San Mateo, California since 2016, and in Irvine, California and Los Angeles, California, since 2022. There are approximately 80 people currently working in Fanatics' Los Angeles Office alone, across a number of Fanatics' business units.

26. Fanatics hired Mr. Hermalyn for his unique skills and talents to help Fanatics VIP thrive. As Head of Fanatics' Los Angeles office, Mr. Hermalyn will oversee and administer the operations of the Los Angeles office (which houses employees from multiple Fanatics businesses), and oversee the planned consolidation of the greater Los Angeles-area offices (including Fanatics' Irvine location) into a single location in Los Angeles.

27. This position requires Mr. Hermalyn to live and work in Los Angeles, California, where Mr. Hermalyn plans to further build out his Fanatics VIP team and have a number of additional direct reports with him in Los Angeles.

28. Before accepting this position with Fanatics VIP, Mr. Hermalyn moved his residence to Los Angeles, California, on January 29, 2024. Mr. Hermalyn signed a rental agreement for an apartment in Los Angeles, California. He purchased a car in California, obtained a California driver's license, registered to vote in California, and obtained an appointment with a physician in California. Mr. Hermalyn is planning on enrolling his two daughters in school in Los Angeles for the next school year and already has contacted summer camps and joined various waitlists.

29. Mr. Hermalyn's role at Fanatics VIP represents an important growth opportunity for Mr. Hermalyn. Being forced by way of a noncompete and nonsolicit agreement to sit out of the betting and gaming space—and beyond—for an entire year would cause serious damage to his professional reputation and future. It would be unfair, prejudicial, and contrary to California's public policy to force Mr. Hermalyn either to continue working at DraftKings and pass up the opportunity to work in California at Fanatics VIP, or otherwise risk having to be benched or restart his career in an entirely new field. So too would it prejudice California-based Fanatics VIP from hiring an employee of its choice, as well as the California consumers who would be served and benefitted by the professional opportunities generated by this employment engagement.

**D. <u>DraftKings' Restrictive Covenants and Foreign Law/Forum Provisions</u>**

30. In connection with his employment by DraftKings, Mr. Hermalyn signed a series of agreements containing post-employment restrictive covenants. These agreements include about a dozen similar non-competition covenants (the "Noncompete Agreements"), and a Nonsolicitation, Nondisclosure & Assignment of Inventions Agreement (the "Nonsolicit Agreement").

31. Signing these Noncompete Agreements and the Nonsolicit Agreement was a condition to Mr. Hermalyn's employment by DraftKings, and a condition to Mr. Hermalyn's receipt from DraftKings of a signification portion of his compensation. Mr. Hermalyn was not independently represented by counsel at the time he signed the agreements. He did not negotiate the agreements, and it was his understanding that any attempt to do so would be a non-starter. These provisions were included in agreements but never explained to employees like Mr. Hermalyn. Mr. Hermalyn signed each of the agreements from his home in New Jersey or remotely via DocuSign but, upon information and belief, never in Massachusetts.

32. The Noncompete Agreements and the Nonsolicit Agreements contain several provisions that are illegal, void, and unenforceable under California law and public policy, including post-employment restrictive covenants and Massachusetts law and forum provisions.

**1. The Noncompete Agreements**

33. DraftKings required Mr. Hermalyn to agree to around a dozen Noncompete Agreements as a condition of his employment and compensation at DraftKings.

34. The terms of the various Noncompete Agreements are similar, but not identical. Indeed, DraftKings made the Agreements even more burdensome over time.

35. For instance, the most recent versions of the Noncompete Agreements issued by DraftKings purport to restrict Mr. Hermalyn's ability, for an entire year, to do any work in the same industries as DraftKings and beyond, anywhere in the world, including California. This was an extension of the restricted period from 6 months to 12 months, and an expansion of the geographic scope from the entire United States to the entire world.

36. The change from 6 months to 12 months was never discussed with Mr. Hermalyn, and he perceived that not signing the Noncompete Agreements would result in equity not being granted and likely termination.

37. For avoidance of doubt, Plaintiffs are challenging all versions of the Noncompete Agreements as illegal, void, and unenforceable under California law and public policy.

38. As a specific example of DraftKings' illegal and unenforceable Noncompete Agreements, the 2023 Noncompete Agreement contains in Section (a) a global, 12-month post-termination noncompete covenant that provides:

> For a period of twelve (12) months following termination of your Relationship[1] with the Company[2] you agree to not, anywhere within the Restricted Area[3] acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of Company): (1) provide services to a Competing

---

[1] "Relationship" is defined as the employee's "relationship with the Company, whether as an owner, shareholder, partner, employee, contractor, agent, advisor or consultant." (Attachment III, section (a)(xv).) This provision was added in later versions of the Noncompete Agreement.

[2] "Company" is defined as "DraftKings Inc., a Nevada corporation, and any person or entity controlled by, controlling, or under common control with DraftKings Inc., a Nevada corporation, including affiliates and subsidiaries." (*Id.* (a)(iii).)

[3] "Restricted Area" is defined in the 2023 Noncompete Agreements as "any place within the United States or anywhere else in the world, since Competing Businesses operate globally and without meaningful limitation to compete caused by geographic locations." (*Id.* (a)(vii).) Previous Noncompete Agreements covered the entire United States.

Business[4] that relate to any aspect of the Business of the Company[5] (*i.e.*, FSC,[6] Gaming,[7] Marketplace,[8] Media,[9] Other Products and Services,[10] and /or Incidental Products and Services[11]) for which you performed services or received Confidential

---

[4] "Competing Business" is defined as "any person, firm, association, corporation or any other entity that is engaged in a business or activity (whether online, at a physical location or otherwise) that is competitive with any aspect of the Business of the Company, including, but not limited to" a list of over 50 companies in the 2023 Noncompete Agreements, and "any of the foregoing persons or entities later known by a different name, any person or entity that acquires, is acquired by, merges with, is spun off by, or otherwise combines with or separates from any of the foregoing persons or entities or enters into an agreement to do so, any person or entity directly or indirectly controlling, controlled by, or under common control with any of the foregoing persons or entities, including, but not limited to, any direct and indirect subsidiaries, affiliates, and ventures of any of the foregoing persons or entities, and any successor or assign of any of the foregoing persons or entities or any person or entity." (*Id.* (a)(iv).) The list of companies in and breadth of this provision have expanded over versions of the Noncompete Agreement.

[5] "Business of the Company" is defined as "the research, design, development, marketing, broadcasting, streaming, promotion, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) [ ] ("FSC"); (2) Gaming; (3) Marketplace; (4) Media; (5) all other products and services that exist, are in development, or are under consideration by the Company during your Relationship with the Company [ ]; and (6) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Gaming, Marketplace, Media or Other Products and Services []." (*Id.* (a)(i).) The breadth of this provision has increased from the first Noncompete Agreement imposed on Mr. Hermalyn.

[6] "FSC" is defined as "any fantasy or simulated activity or contest where winning outcomes are determined predominantly by accumulated statistical results of the performance of individuals in athletic or other events; the wining outcome reflects the knowledge and skill of the participant; and a winning outcome is not based solely on the performance of a single team or individual." (*Id.* (a)(vii).)

[7] "Gaming" is defined as "games of chance or skill, pari-mutuel, fixed odds, pools or otherwise (including, but not limited to, lottery, pari-mutuel betting, bingo, horse and dog racing, simulated racing and sporting events, jai alai, sports betting, online casino games/iGaming, social casino, poker and keno) whether played for real money or cash equivalent, virtual currency, free, or otherwise and any type of ancillary service or product related to the foregoing." (*Id.* (a)(viii).)

[8] "'Marketplace' shall mean a digital platform facilitating the purchase and sale of nonfungible tokens and other collectibles." (*Id.* (a)(x).) This provision was added in later versions of the Noncompete Agreement.

[9] "'Media' shall mean the development, distribution, procurement and programming of content offerings in audio and video focused media related to sports, Gaming, FSC, Marketplace or Other Products and Services." (*Id.* (a)(xi).) This provision was added in later versions of the Noncompete Agreement.

[10] "Other Products and Services" is defined as "all other products and services that exist, are in development, or are under consideration by the Company during [Plaintiff's] Relationship with the Company." (*Id.* (a)(i).)

[11] "Incidental Products and Services" is defined as "all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Gaming, Marketplace, Media or Other Products and Services." (*Id.*)

> Information[12] at any time during the six (6) month period prior to such termination;[13] or (2) commit a Threatened Breach[14] of the obligation set forth in the immediately preceding clause.
>
> For example, in the event that you performed services for the FSC aspect of the Business of the Company and received Confidential Information about the Gaming aspect of the Business of the Company during the six (6) month period prior to the termination of your Relationship with the Company, then for twelve (12) months after such termination, you shall not, anywhere within the Restricted Area, acting individually, or as an owner, shareholder, partner, employee, contractor, agent or otherwise (other than on behalf of the Company), provide services to a Competing Business that relates to FSC or Gaming, or commit a Threatened Breach of that obligation. The foregoing shall not be construed to preclude you from owning up to one percent (1%) of the outstanding stock of a publicly held corporation that constitutes or is affiliated with a Competing Business. . . .[15]

39. DraftKings' other Noncompete Agreements likewise purport to broadly bar Mr. Hermalyn in a substantially similar way, with the breadth of the restraints growing over time and with subsequent iterations of DraftKings' Noncompete Agreement.

40. The scope of the Noncompete Agreements are vastly overbroad, including but not limited to the defined terms "Business of the Company," "Competing Business," and

---

[12] "Confidential Information" is defined as "all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors of the Company or the public, which Company considers to be confidential and/or proprietary, including, but not limited to: research and development; techniques; methodologies; strategies; product information, designs, prototypes and technical specifications; algorithms, source codes, object codes, trade secrets and technical data; training materials and methods; internal policies and procedures; marketing plans and strategies; pricing and cost policies; customer, supplier, vendor and partner lists and accounts; customer and supplier preferences; contract terms and rates; financial data, information, reports, and forecasts; inventions, improvements and other intellectual property; product plans and proposed product plans; know-how; designs, processes and formulas; software and website applications; computer passwords; market and sales information, plans and strategies; business plans, prospects and opportunities (including, but not limited to, possible acquisitions or dispositions of businesses or facilities); information concerning existing or potential customers, partners or vendors. Confidential information shall also mean information related to Company's current or potential customers. vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner." (*Id.* (a)(v).)

[13] Certain versions of the Noncompete Agreement do not contain any temporal limitation as to services provided or information obtained before termination of employment.

[14] "Threatened Breach" is defined as "any attempt by you to engage in conduct that would breach these Terms and Conditions." (*Id.* (a)(xviii).) This provision was added in later versions of the Noncompete Agreement.

[15] In-text defined terms are omitted from this block quote.

"Confidential Information." They would seemingly prevent Mr. Hermalyn from taking *any job* in the industries in which DraftKings and its competitors operate and beyond.

41. The Noncompete Agreements effectively contain no geographic limitation. In the most recent versions, the Noncompete Agreements apply everywhere in the ***world***. Even in the earlier versions, the restrictions applied everywhere in the United States.

42. The Noncompete Agreements state that in the event of breach—or, in the most recent versions, even in the event of a mere "Threatened Breach" or "challenge" to "the enforceability" of the Noncompete Agreements—DraftKings has the "sole and absolute discretion, for any reason or no reason" to deem "forfeited" any unvested or vested but unsettled equity.[16] This equity was a significant part of Mr. Hermalyn's compensation as an employee of DraftKings. DraftKings' one-sided provisions purport to give DraftKings boundless discretion to take away this compensation for engaging or even seeming to "threaten" to engage in protected conduct regarding challenging the enforceability of this illegal contractual restraint.

43. The Noncompete Agreements contain procedurally unfair terms that are substantively disconnected from the equity compensation awards, such as requiring Mr. Hermalyn to forego any jury trial right (section (f))[17] and to agree that DraftKings is entitled to extraordinary remedies (section (e)). Section (e) provides that "any breach, Threatened Breach or challenge to the enforceability of this Noncompetition Covenant would cause the Company to suffer immediate and irreparable harm for which monetary damages are inadequate" such that DraftKings "shall be automatically entitled to a temporary, preliminary and permanent injunction restraining such breach, Threatened Breach or challenge requiring specific performance, in addition to any and all rights and remedies at law and equity."[18] It provides that DraftKings "shall not be obligated to present additional evidence of irreparable harm or the insufficiency of monetary damages and, to

---

[16] See Attachment III, Section (n) in Noncompete Agreements from 2023. Prior versions of the Noncompete Agreement similarly contained equity forfeiture provisions.

[17] DraftKings added the purported jury trial waiver in 2022 and 2023 versions of the Noncompete Agreement.

[18] See Attachment III, Section (e) in Noncompete Agreements from 2023. Prior versions of the Noncompete Agreement contained similar extraordinary remedy provisions for DraftKings.

the extent permitted by law or under applicable court rule, does not need to post a bond or other surety."[19] It further provides that DraftKings is entitled to attorneys' fees and costs related to any of breach or challenge before the employee "relent[s]."[20]

44. The Noncompete Agreements Section (f) contain a Massachusetts law and forum provision. DraftKings purports to select Massachusetts law as the basis for its broad and unfair Noncompete Agreements, but it attempts to *avoid* Massachusetts's choice-of-law doctrine, under which the Massachusetts Supreme Court has applied *California*'s law invalidating non-competition provisions for a California-based employee, even where the employee and former employer had a contractual choice-of-law and forum provision selecting Massachusetts, as is the case here.

45. As an example, the 2023 Noncompete Agreement Section (f) provides:

> You and the Company hereby mutually agree to the exclusive jurisdiction of the Business Litigation Session ("BLS") of the Suffolk Superior Court of the Commonwealth of Massachusetts (and, in the event that the BLS declines to accept jurisdiction, to the exclusive jurisdiction of the Suffolk Superior Court of the Commonwealth of Massachusetts) or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly. with respect to any such court action, you (a) submit to the personal jurisdiction of such courts; (b) consent to service of process by regular mail to your last known address; and (c) waive any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process. In the event that you commence a legal action or other proceeding outside of Massachusetts against the Company concerning a dispute arising from or relating to this Noncompetition Covenant you shall reimburse the Company for its reasonable attorneys' fees, costs and expenses incurred in the event that the Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Noncompetition Covenant shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

46. In sum, DraftKings forced on Mr. Hermalyn, as a requirement of his employment and compensation, an escalating series of one-sided, over-broad versions of DraftKings' Noncompete Agreement, purporting to impose enormously burdensome restraints on

---

[19] *Id.*

[20] *Id.* This part of the provision was added in 2022 and 2023 versions of the Noncompete Agreement.

Mr. Hermalyn's ability to obtain any other employment in his chosen field and engage in protected activity challenging these unlawful restraints.

**2. The Nonsolicit Agreement**

47. DraftKings required Mr. Hermalyn to agree to a Nonsolicit Agreement as a condition of his employment at DraftKings.

48. The Nonsolicit Agreement purports to restrict Mr. Hermalyn's ability, for an entire year, to solicit or service clients, vendors, and employees of DraftKings, irrespective of the desires of those clients, vendors, and employees to associate with Mr. Hermalyn and a subsequent employer, anywhere in the world, including California.

49. Specifically, the Nonsolicit Agreement Section (2) contains a customer, client or vendor nonsolicitation and no-service provision that provides:

> During the period of Employee's relationship with the Company[21] and for a period of twelve (12) months after termination of such relationship (for any reason), Employee shall not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise, solicit or transact business, or attempt to solicit or transact business with, any of the Company's customers, clients, vendors or partners, or with any of the Company's prospective customers, clients, vendors or partners about which Employee learned Confidential Information[22] … or which Employee had some involvement or knowledge related to the Business of the Company.[23]

---

[21] "Company" is defined as "any entity controlled by, controlling, or under common control with DraftKings Inc., including affiliates and subsidiaries." (Definitions, section (i).)

[22] "Confidential Information" is defined as "all information or a compilation of information, in any form (tangible or intangible or otherwise), that is not generally known to competitors or the public, which Company considers to be confidential and/or proprietary, including but not limited to" a list of twenty-one broad categories, such as "research and development" and "techniques," as well as information "of or related to [the] Company's current or potential customers, vendors or partners that is considered to be confidential or proprietary to the applicable customer, vendor or partner." (Definitions, section (iii).)

[23] "Business of the Company" is defined as "the research, design, development, marketing, sales, operations, maintenance and commercial exploitation pertaining to the operation of, and providing products and services for: (1) fantasy sports contests ('FSC'); (2) Regulated Gaming ([defined as "the operation of games of chance or skill or parimutuel or fixed odds games … and any type of ancillary service or product related to or connected with the foregoing"]); (3) all other products and services that exist, are in development, or are under consideration by the Company during your relationship with the Company ('Other Products and Services'); and (4) all products and services incidentally related to, or which are an extension, development or expansion of, FSC, Regulated Gaming and/or Other Products and Services ('Incidental Products and Services')." (Definitions, sections (ii).)

50. The Nonsolicit Agreement Section (3) contains an employee nonsolicitation and no- hire provision that provides:

> During the period of Employee's relationship with the Company and for a period of twelve (12) months after termination of such relationship (for any reason), Employee will not directly or indirectly either for him/herself or for any other person, partnership, legal entity, or enterprise: (i) solicit, in person or through supervision or control of others, an employee, advisor, consultant or contractor of the Company for the purpose of inducing or encouraging the employee, advisor, consultant or contractor to leave his or her relationship with the Company or to change an existing business relationship to the detriment of the Company, (ii) hire away an employee, advisor, consultant or contractor of the Company; or (iii) help another person or entity hire away a Company employee, advisor, consultant or contractor.

51. The Nonsolicit Agreement is vastly overbroad, including as to the defined terms "Business of the Company" and "Confidential Information." They would seemingly prevent Mr. Hermalyn from working with the employees and clients of his choice, including those in California, even if they wish to work with him or even, arguably, maintaining relationships with others. Given the client-oriented nature of his role, the client nonsolicit is essentially another form of a noncompete ban. Given Mr. Hermalyn's new Head of Office role, the employee no-hire ban could seemingly restrict his entire office, in violation of federal law against no-poach agreements.

52. The Nonsolicit Agreement contains no geographic limitation and applies everywhere in the United States and everywhere in the world.

53. The Nonsolicit Agreement Section (9) contains a Massachusetts law and forum provision that provides:

> The parties hereby mutually agree to the exclusive jurisdiction of the Superior Court (inclusive of the Business Litigation Session) of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts for any dispute arising hereunder. Accordingly, with respect to any such court action, Employee (a) submits to the personal jurisdiction of such courts; (b) consents to service of process by regular mail to your last known address; and (c) waives any other requirement (whether imposed by statute, rule of court, or otherwise) with respect to personal jurisdiction or service of process. If Employee commences a legal action or other proceeding against the Company concerning a dispute arising from or relating to this Agreement outside of Massachusetts, Employee shall reimburse the Company for its reasonable attorneys' fees, costs and expenses if Company prevails in staying, transferring, dismissing or otherwise defending such action or proceeding based on the location of the action or proceeding, regardless of whether such fees, costs and expenses are incurred in the forum where you commenced the action or in a Massachusetts forum. This Agreement shall be governed by the internal substantive laws of Massachusetts, without regard to the doctrine of conflicts of law.

54. As with its unlawful Noncompete Agreement, DraftKings' Nonsolicit Agreement purports to bar Mr. Hermalyn from engaging in his chosen profession in California.

**E. DraftKings' Restrictive Covenants and Foreign Law/ Forum Provisions Are Illegal, Void, and Unenforceable Under California Law and Public Policy**

55. The State of California has long-standing law and public policy against post-employment restrictive covenants, and strongly favors employee mobility and disfavors anticompetitive restraints on trade.

56. California Business & Professions Code Section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

57. For decades, California courts have relied on this statute to prohibit noncompete, client nonsolicit, and employee nonsolicit agreements with employees in California like those at issue here.[24]

58. California courts have declined to enforce foreign state forum selection clauses in restrictive covenant cases involving California residents.[25] California courts have further declared post-employment restrictive covenant provisions illegal and unenforceable under California law,

[24] See, e.g., *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.* (2018) 28 Cal.App.5th 923, 940 [nonsolicitation of employees provision was void, because Section 16600 "precludes an employer from restraining an employee from engaging in his or her 'profession, trade, or business,' even if such an employee uses information that is confidential but not a trade secret" in soliciting employees or customers]; *Retirement Group v. Galante* (2009) 176 Cal.App.4th 1226, 1238 ["[S]ection 16600 bars a court from specifically enforcing (by way of injunctive relief) a *contractual* clause purporting to ban a former employee from soliciting former customers to transfer their business away from the former employer to the employee's new business[.]"]; *Dowell v. Biosense Webster, Inc.* (2009) 179 Cal.App.4th 564, 575 [nonsolicitation provision that prevented employees from soliciting customers who sold or rendered services to the employee's clients was invalid]; *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 948 [noncompetition and customer nonsolicitation provisions void, where they restricted accountant from performing work for his former employer's clients and practicing his profession of choice].)

[25] See e.g., *Am. Online, Inc. v. Super. Ct*. (2001) 90 Cal.App.4th 1, 12 (2001), *as modified* (July 10, 2001) ["California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy"]; *G Cos. Management, LLC v. LREP Ariz., LLC* (2023) 88 Cal.App.5th 342, 350 [refusing enforcement of forum selection clause for California resident and employee]; *Verdugo v. Alliantgroup, L.P*. (2015) 237 Cal.App.4th 141, 147 [refusing enforcement of forum selection clause for California resident and employee].)

even where the employees at issue ***did not reside in California*** (but were employed by a California company), and the agreements at issue called for application of another state's law (rather than California law).[26]

59. Last year, the California legislature passed two new laws, California Business & Professions Code Sections 16600.5 and 16600.1, effective January 1, 2024, which codify California's prohibition on noncompete agreements even to ***agreements between employers and employees in other states***. These laws impose new, mandatory notification requirements on businesses that utilize noncompetes, provide that violations of the restraint of trade laws would constitute acts of unfair competition, and permit a private right of action for injunctive relief and/or monetary damages for such violations.

60. One of these new laws, codified at California Business & Professions Code Section 16600.5, codify the reach of California's prohibition against noncompete agreements by specifying that any contract that is void under Section 16600 "is unenforceable ***regardless of where and when the contract was signed***." (Bus. & Prof. Code, § 16600.5, subd. (a), emphasis added.)

61. Section 16600.5 adds that an employer may not "enter into a contract with an employee or prospective employee that includes a provision that is void" under Section 16600, and bars "an employer or former employer" from attempting "to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California." (Bus. & Prof. Code, § 16600.5, subd. (b).)

62. The Legislature's underlying findings for Section 16600.5 state that "California's public policy against restraint of trade law trumps other state laws when an employee seeks employment in California, even if the employee had signed the contractual restraint while living outside of California and working for a non-California employer." (Sen. Bill No. 699 (2023–2024 Reg. Sess.) § 1(e).)

---

[26] See *Application Grp., Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 900–901, 905 [noting that "California has a strong interest in protecting the freedom of movement of persons whom California-based employers [ ] wish to employ to provide services in California, regardless of the person's state of residence or precise degree of involvement in California projects"].)

63. The Legislature went on to express the importance of an employee's freedom of movement, stating: "California has a strong interest in protecting the freedom of movement of persons whom California-based employers wish to employ to provide services in California, regardless of the person's state of residence. This freedom of employment is paramount to competitive business interests." (*Id.* § 1(f).)

64. Indeed, the legislative history explicitly recognizes that the amendments "would prohibit any employer from attempting to enforce a void contract, ***including seeking enforcement in a non-California court***" and authorize remedies when an employer violates this prohibition. (Assem. Com. on Lab. & Employment, Background Information Request for Sen. Bill 699 (2023–2024 Reg. Sess.) p. AP1-2, emphasis added.)

65. Section 16600.5 creates a private right of action for employees, former employees, and prospective employees to seek injunctive relief, actual damages, or both if an employer either (i) enters into a contract that is void under Section 16600 or 16600.5 or (ii) attempts to enforce such a contract. (Bus. & Prof. Code, § 16600.5.) The law entitles employees to recover their attorneys' fees for enforcing their rights. (*Id.* § 16600.5, subd. (e)(2).)

66. The second of the new laws codified California Business & Professions Code Section 16600.1 and amended Section 16600 to be "read broadly" to "void the application of any noncompete agreement in an employment context . . . ." (Bus. & Prof. Code, § 16600, subd. (b)(1).) The amendments to Section 16600 confirm that it is not "limited to contracts where the person being restrained from engaging in a lawful profession, trade, or business is a party to the contract." (*Id.* § 16600, subd. (c).)

67. Section 16600.1 specifies that it is "unlawful" to include a noncompete clause in an employment contract or to require an employee to enter a noncompete agreement as a condition of employment. (Bus. & Prof. Code, § 16600.1, subd. (a).)

68. Section 16600.1 imposes an affirmative notice obligation on employers who have utilized noncompete agreements. By February 14, 2024, all such employers must notify any current or former employees (employed after January 1, 2022) that the noncompete provisions in

their agreements are void. An individualized communication to the employee or former employee is required. (Bus. & Prof. Code, § 16600.1, subd. (b).)

69. Section 16600.1 adds that any violation of these requirements "constitutes an act of unfair competition" within the meaning of California's Unfair Competition Law, codified at California Business & Professions Code sections 17200 et seq. (Bus. & Prof. Code, § 16600.1, subd. (c).) California's Unfair Competition Law, in turn, allows for enforcement either by private parties or state regulators, and restitution or injunctive relief. (*Id.* § 17200 et seq.)

70. Under this California law and public policy, the post-employment restrictive covenants, including the Massachusetts law and forum provisions, in all of DraftKings' Noncompete Agreements and the Nonsolicit Agreement are illegal, void, and unenforceable under California law and public policy as applied to Mr. Hermalyn.

### F. <u>DraftKings' Enforcement of the Restrictive Covenants and Foreign Law/Forum Provisions Violates California Law</u>

71. DraftKings has improperly sought to constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict Fanatics VIP from employing him. DraftKings is expected to attempt to enforce the illegal, void, and unenforceable restrictive covenants and foreign law and forum provisions against Mr. Hermalyn and Fanatics VIP in Massachusetts. These actions directly violate California law and public policy.

72. Given the parties' dispute over the validity and enforceability of the restrictive covenants and foreign law and forum provisions, a justiciable controversy ripe for judicial resolution now exists between Mr. Hermalyn and Fanatics VIP, on one hand, and DraftKings, on the other hand. This Court should grant the requested relief to clarify and redress the illegality of DraftKings' anti-mobility restrictive covenants with Mr. Hermalyn and any other contractual impediments to his ability to lawfully continue his employment with Fanatics VIP in California.

**FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF**
**CODE CIV. PROC. SECTION 1060**
**(By All Plaintiffs Against DraftKings)**

73. Plaintiffs repeat, allege, and incorporate by reference as though fully set forth herein all the allegations contained in Paragraphs 1 through 72.

74. Pursuant to California Code of Civil Procedure Section 1060, an actual, present, and justiciable controversy exists between Mr. Hermalyn, Fanatics VIP, and DraftKings concerning the enforceability of the Noncompete Agreements and the Nonsolicit Agreement, and specifically whether the restrictive covenants and the Massachusetts law and forum provisions are void under California law and public policy banning restraints of trade and employee mobility.

75. Mr. Hermalyn and Fanatics VIP believe that the restrictive covenants and Massachusetts law and forum provisions in the Noncompete Agreements and the Nonsolicit Agreement are illegal, void, and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1. Under Sections 16600.5 and 16600.1, effective January 1, 2024, California's prohibition on noncompete agreements was codified even to ***agreements between employers and employees in other states***—including Mr. Hermalyn's agreements with DraftKings. The restrictive covenants are overbroad as to duration, scope, and geographic territory, and are not narrowly tailored to protect DraftKings' trade secrets or confidential information.

76. California is the appropriate forum for this action and has a materially greater interest than Massachusetts given that Mr. Hermalyn, Fanatics VIP, and Mr. Hermalyn's new role are located here. Forcing Plaintiffs to litigate in Massachusetts would be unreasonable and prejudicial, particularly given that neither has any ties to Massachusetts. For the same reasons, California—not Massachusetts—law should govern.

77. DraftKings contends that the restrictive covenants and Massachusetts law and forum provisions in the Noncompete Agreements and the Nonsolicit Agreement are valid and enforceable under Massachusetts law, and, as such, that Mr. Hermalyn must comply with these provisions and Fanatics VIP must not interfere with them. DraftKings has sought to improperly constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in

California, and to improperly restrict Fanatics VIP from employing him. DraftKings is further expected to attempt to enforce the illegal, void, and unenforceable restrictive covenants and foreign law and forum provisions against Mr. Hermalyn and Fanatics VIP in Massachusetts.

78. Given the parties' ongoing dispute over enforceability of contractual provisions at issue, the requested declaratory relief is needed to clarify the rights and obligations of the parties.

79. Specifically, Mr. Hermalyn and Fanatics VIP request a declaratory judgment from the Court that: (i) Mr. Hermalyn may freely compete against DraftKings, including by working as the President of Fanatics VIP and the Head of Fanatics' Los Angeles, California office, providing services to the businesses across the Fanatics portfolio of companies (including companies engaged in the collectibles, betting and gaming, licensed merchandise, media and events business), soliciting and servicing clients on behalf of Fanatics VIP, and recruiting, soliciting, and hiring employees to Fanatics VIP; (ii) Fanatics VIP may continue to employ Mr. Hermalyn in this capacity; (iii) Mr. Hermalyn's post-employment restrictive covenants with DraftKings, including the noncompete, client nonsolicit and no-service, employee nonsolicit and no-hire prohibitions, are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; (iv) the Massachusetts choice of law and forum provisions are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; (v) the jury trial waiver provision is void under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1, as part of an illegal and unenforceable noncompete agreement, and under California Civil Code Section 631.

80. Plaintiffs' request for declaratory relief should be granted.

**SECOND CAUSE OF ACTION FOR INJUNCTIVE RELIEF**
**BUS. & PROF. CODE SECTION 16600.5**
**(By Mr. Hermalyn Against DraftKings)**

81. Mr. Hermalyn repeats, alleges, and incorporates by reference as though fully set forth herein all the allegations contained in Paragraphs 1 through 80.

82. Mr. Hermalyn seeks injunctive relief against DraftKings affirmatively voiding his post-employment restrictive covenants and the Massachusetts law and forum provisions contained

in Mr. Hermalyn's agreements with DraftKings under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1, enjoining DraftKings from violating these laws, and enjoining related suits by DraftKings.

83. Section 16600.5 expressly provides for a private right of action for an employee to sue for injunctive relief. It states: "[a]n employer that enters into a contract that is void under this chapter or attempts to enforce a contract that is void under this chapter commits a civil violation," and violation of this statute empowers a past, present or prospective employee to bring "a private action to enforce this chapter for injunctive relief or the recovery of actual damages, or both." (Bus. & Prof. Code, § 16600.5, subds. (d), (e)(1).)

84. The restrictive covenants and Massachusetts law and forum provisions in the Noncompete Agreements and the Nonsolicit Agreement are illegal, void, and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1. Under Sections 16600.5 and 16600.1, effective January 1, 2024, California's prohibition on noncompete agreements was codified even to ***agreements between employers and employees in other states***—including Mr. Hermalyn's agreements with DraftKings here. The restrictive covenants are overbroad as to duration, scope, and geographic territory, and are not narrowly tailored to protect DraftKings' trade secrets or confidential information.

85. DraftKings has sought to improperly constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict Fanatics VIP from employing him. DraftKings is further expected to enforce the illegal, void, and unenforceable restrictive covenants and foreign law and forum provisions against Mr. Hermalyn and Fanatics VIP in Massachusetts.

86. Accordingly, Mr. Hermalyn is entitled to the injunctive relief requested. Mr. Hermalyn additionally reserves his rights to recover damages and reasonable attorneys' fees and costs as provided in the statute. (Bus. & Prof. Code, § 16600.5, subd. (e)(2).)

**THIRD CAUSE OF ACTION FOR UNFAIR COMPETITION**
**BUS. & PROF. CODE SECTIONS 17200 ET SEQ.**
**(By All Plaintiffs Against DraftKings)**

87. Plaintiffs repeat, allege, and incorporate by reference as though fully set forth herein all the allegations contained in Paragraphs 1 through 86.

88. It has long been held in California that "[a]n employer's use of an illegal noncompete agreement also violates the UCL." (See *Dowell v. Biosense Webster, Inc.* (2009) 179 Cal.App.4th 564, 575 [citing *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 906–908; see also *Robinson v. U-Haul Co. of Cal.* (2016) 4 Cal.App.5th 304, 314–316 [affirming grant of permanent injunction against employer whose unlawful non-competition agreement and attempts to enforce it constituted an unfair business practice]; *Khan v. K2 Pure Solutions, LP* (N.D. Cal. 2013) 981 F. Supp. 2d 860, 864 [use of an agreement that contained an illegal noncompete provision "by definition, violates the UCL"].)

89. Section 16600.1 separately specifies that it is "unlawful" to include a noncompete clause in an employment contract or to require an employee to enter a noncompete agreement as a condition of employment and that a violation of this "constitutes an act of unfair competition" within the meaning of California's Unfair Competition Law, codified at California Business & Professions Code Sections 17200 et seq. (Bus. & Prof. Code, §§ 16600.1, 17200 et seq.)

90. The restrictive covenants and Massachusetts law and forum provisions in the Noncompete Agreement and the Nonsolicit Agreement are illegal, void, and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1. Under Sections 16600.5 and 16600.1, effective January 1, 2024, California's prohibition on noncompete agreements was codified even to ***agreements between employers and employees in other states***—including Mr. Hermalyn's agreements with DraftKings here. The restrictive covenants are overbroad as to duration, scope, and geographic territory, and are not narrowly tailored to protect DraftKings' trade secrets or confidential information.

91. DraftKings has sought to improperly constrain Mr. Hermalyn from pursuing a lawful profession of his choosing with Fanatics VIP in California, and to improperly restrict Fanatics VIP from employing him. DraftKings is further expected to attempt to enforce the

illegal, void, and unenforceable restrictive covenants and foreign law and forum provisions against Mr. Hermalyn and Fanatics VIP in Massachusetts.

92. DraftKings' restrictive covenants and Massachusetts law and forum provisions in the Noncompete Agreement and the Nonsolicit Agreement with Mr. Hermalyn, as alleged herein, contain unenforceable restrictive covenants, and DraftKings' maintenance of same constitute unlawful, unfair, deceptive, and misleading business practices, prohibited by California Business & Professions Code Sections 17200. (Bus. & Prof. Code, §§ 16600.1, 17200.)

**PRAYER FOR RELIEF**

*WHEREFORE,* Mr. Hermalyn and Fanatics VIP demand judgment against DraftKings as follows:

93. For a judicial declaration that (i) Mr. Hermalyn may freely compete against DraftKings, including by working as the President of Fanatics VIP and Head of Fanatics' Los Angeles, California office, including by providing services to the businesses across the Fanatics portfolio of companies (including companies engaged in the collectibles, betting and gaming, licensed merchandise, and media and events business), soliciting and servicing clients on behalf of Fanatics VIP, and recruiting, soliciting, and hiring employees to Fanatics VIP; (ii) Fanatics VIP may continue to employ Mr. Hermalyn in this capacity; (iii) Mr. Hermalyn's post-employment restrictive covenants with DraftKings, including the noncompete, client nonsolicit and no-service, and employee nonsolicit and no-hire prohibitions, are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; (iv) the Massachusetts choice of law and forum provisions are void and unenforceable under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1; and (v) the jury trial waiver provision is void under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1, as part of an illegal and unenforceable noncompete agreement, and under California Civil Code Section 631.

94. Injunctive relief voiding the post-employment restrictive covenants and the Massachusetts law and forum provisions contained in Mr. Hermalyn's agreements with

DraftKings under California law and public policy, including California Business & Professions Code Sections 16600, 16600.5, and 16600.1, and enjoining DraftKings from violating same or enforcing same in court.

95. Actual damages arising from DraftKings' inclusion and maintenance of unlawful restrictive covenants, requirement that Mr. Hermalyn enter such agreements, as well as reasonable attorneys' fees and costs as provided in California Business & Professions Code Sections 16600.5 (e)(2), 16600.1, and 17200.

96. For such other and further relief as the Court deems proper and just.

**JURY DEMAND**

97. Plaintiffs demand a trial by jury on all issues so triable.

DATED: February 1, 2024

Respectfully Submitted,

MUNGER, TOLLES & OLSON LLP

By: ______________________

BRAD D. BRIAN
BETHANY 1. KRISTOVICH
ANNE K. CONLEY
Attorneys for Plaintiff
MICHAEL Z. HERMALYN

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: ______________________

DAVID C. ARMILLEI
MICHAEL B. CARLINSKY
Attorneys for Plaintiff
FVP, LLC